IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON

DONALD A. ADKINS,

       Plaintiff,

v.                             CASE NO. 2:07-cv-631

MICHAEL J. ASTRUE,
Commissioner of Social Security,

       Defendant.


# M E M O R A N D U M   O P I N I O N

This is an action seeking review of the decision of the Commissioner of Social Security denying Claimant's applications for disability insurance benefits ("DIB") and supplemental security income ("SSI"), under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. This case is presently pending before the court on cross-motions for judgment on the pleadings. Both parties have consented in writing to a decision by the United States Magistrate Judge.

Plaintiff, Donald A. Adkins (hereinafter referred to as "Claimant"), filed applications for SSI and DIB on June 24, 2003, alleging disability as of January 31, 1997, due to degenerative arthritis, herniated discs, hepatitis C, liver, neck, arms, wrists, back, knees, ankle, shoulder, hands, allergy to sun, heart condition, depression and anxiety. (Tr. at 15, 28, 33, 57-59, 80-88, 495-497.) The claims were denied initially and upon

reconsideration.  (Tr. at 15, 28-31, 33-35.)  On February 27, 2004, Claimant requested a hearing before an Administrative Law Judge ("ALJ").  (Tr. at 40.)  The hearing was held on May 4, 2005, before the Honorable Karen B. Peters.  (Tr. at 46, 50, 512-559.)  By decision dated July 6, 2005, the ALJ determined that Claimant was not entitled to benefits.  (Tr. at 15-25.)  The ALJ's decision became the final decision of the Commissioner on August 10, 2007, when the Appeals Council denied Claimant's request for review. (Tr. at 7-10.)  On October 11, 2007, Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g).

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(i), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972).  A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims.  20 C.F.R. §§ 404.1520, 416.920 (2002).  If an individual is found "not disabled" at any step, further inquiry is unnecessary.  Id. §§ 404.1520(a), 416.920(a).  The first inquiry under the sequence is

whether a claimant is currently engaged in substantial gainful employment. Id. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. Id. §§ 404.1520(e), 416.920(e). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. §§ 404.1520(f), 416.920(f) (2002). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574

3

(4th Cir. 1976).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because he has not engaged in substantial gainful activity since the alleged onset date. (Tr. at 17.) Under the second inquiry, the ALJ found that Claimant suffers from the severe impairments of traumatic and degenerative joint disease with bilateral carpal tunnel syndrome (post surgery) and myofascial pain syndrome, as well as mild coronary artery disease, hepatitis C, mild depression, and chronic poly-substance abuse. (Tr. at 17.) At the third inquiry, the ALJ concluded that Claimant's impairments do not meet or equal the level of severity of any listing in Appendix 1. (Tr. at 18-19.) The ALJ then found that Claimant has a residual functional capacity for most unskilled light work, reduced by nonexertional limitations. (Tr. at 21.) As a result, Claimant cannot return to his past relevant work. (Tr. at 21-22.) Nevertheless, the ALJ concluded that Claimant could perform jobs such as watch guard, vehicle/equipment cleaner, parking lot attendant, and domestic cleaning jobs which exist in significant numbers in the national economy. (Tr. at 23.) On this basis, benefits were denied. (Tr. at 23-25.)

Scope of Review

The sole issue before this court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was

4

defined as

> "evidence which a reasoning mind would accept
> as  sufficient  to  support  a  particular
> conclusion.  It  consists  of  more  than  a  mere
> scintilla of evidence but may be somewhat less
> than a preponderance. If there is evidence to
> justify a refusal to direct a verdict were the
> case before a jury, then there is 'substantial
> evidence.'"

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting

Laws  v.  Cellebreze,  368  F.2d  640,  642  (4th  Cir.  1966)).

Additionally,  the  Commissioner,  not  the  court,  is  charged  with

resolving  conflicts  in  the  evidence.   Hays  v.  Sullivan, 907 F.2d

1453, 1456 (4th Cir. 1990).  Nevertheless, the courts "must not

abdicate their traditional functions; they cannot escape their duty

to  scrutinize  the  record  as  a  whole  to  determine  whether  the

conclusions  reached  are  rational."  Oppenheim v. Finch, 495 F.2d

396, 397 (4th Cir. 1974).

A  careful  review  of  the  record  reveals  the  decision  of  the

Commissioner  is  supported  by  substantial  evidence.

Claimant's Background

Claimant  was  42  years  old  at  the  time  of  the  administrative

hearing.  (Tr. at 16.)  He has a high school education.  (Tr. at

533.)  In the past, he worked as a construction worker and steel

mill worker.  (Tr. at 554.)

The Medical Record

The  court  has  reviewed  all  evidence  of  record,  including  the

medical evidence of record, and will summarize it further below.

<u>Physical Evidence</u>:

On November 19, 1999, Claimant had an MRI of the lumbar and cervical spines.  Dennis M. Burton, M.D., interpreted the MRI's and found the lumbar spine had "very minimal degenerative change, otherwise unremarkable study."  (Tr. at 125.)  Dr. Burton found in regard to the cervical spine that Claimant had degenerative change "with focal right lateral HNP [herniated nucleus pulposus] C5-6 and borderline focal central and left lateral HNP at C6-7."  (Tr. at 125.)

On April 3, 2001, Claimant had a CT of the abdomen.  Rodger Blake, M.D. made the following interpretation:  "The lower lung bases are clear.  Opaque tablets are noted within the stomach.  The liver, spleen, pancreas, gallbladder, adrenal glands, and kidneys are unremarkable.  No mass, abscess, adenopathy, or ascites is noted.  Impression:  Negative."  (Tr. at 161.)

The record contains reports from Marshall University Physicians and Surgeons, Inc. dated March 23, 2000 through November 12, 2003, relating primarily to Claimant's chronic hepatitis C infection.  (Tr. at 126-60.)

A March 23, 2000 clinic note from Waseem Shora, M.D. states:

Hepatitis C antibody was positive...Hepatitis A antibody
was positive.  Hepatitis B surface antigen was
negative...
Impression:
1.  Hepatitis C.
A.  With normal liver function.
B.  He was thought to have this since 1993.
2.  History of IV drug use.

3.  History of alcoholism, the patient stated that he stopped that 3-4 years ago.

(Tr. at 149-50.)

A September 21, 2000, clinic note from Maksim Grishkevich, M.D. states:  "The claimant is completing Rebetron treatments after three doses, and then will obtain hep-C RNA [ribonucleic acid] count by PCR [polymerase chain reaction] to see if the patient has had any response to the treatment."  (Tr. at 140.)

A February 27, 2002, clinic note from Dr. Shora states: "Hepatitis C status post treatment with ribavirin and interferon x six months, which has failed." (Tr. at 133.)

An October 23, 2002, clinic note from Dr. Shora states:  "The patient has hepatitis C infection with failed interferon and ribavirin therapy, no further treatment is indicated at this point in time."  (Tr. at 129.)

The record contains reports from Cabell Huntington Hospital Regional Pain Management Center dated January 16, 2001 through December 3, 2003, showing treatment by Ahmet Ozturk, M.D.  (Tr. at 163-87.)

In a January 16, 2001 progress note, Dr. Ozturk states Claimant has been treated for lumbar radiculopathy, sacroiliac joint syndrome, and myofascial pain syndrome.  Dr. Ozturk states: "We did not plan any injections because he improved with physical therapy.  However, he came to a plateau in terms of physical therapy and his pain is staying the same.  For that reason, we will

7

start injections." (Tr. at 187.)

Operative reports dated October 30, 2003, April 28, 2003, December 19, 2002, August 5, 2002, April 22, 2002, February 12, 2002, November 26, 2001, October 30, 2001, July 30, 2001, May 15, 2001, and April 26, 2001, show that Dr. Ozturk performed trigger point injections. (Tr. at 184-67.)

A December 3, 2003 operative report from Dr. Ozturk indicates Claimant underwent an epidural steroid injection. (Tr. at 163-65.) A March 25, 2003 progress note from Dr. Ozturk states that he has discussed with Claimant doing an SI joint denervation but will not schedule it until Claimant has insurance or Social Security. (Tr. at 170.)

On February 14, 2003, Paulette Wehner, M.D., Pro Imaging Diagnostic Center, examined Claimant at the request of Dr. Wehrheim of Lincoln Primary Care Center, following Claimant's abnormal nuclear stress test and complaints of chest pain. Dr. Wehner found: "EKG shows normal sinus rhythm, normal axis, early repolarization. Laboratory values are pending. Stress test shows mild inferior wall myocardial ischemia with an ejection fraction of 60%... Recommendation: 1. Proceed to diagnostic left heart catheterization, selective coronary angiography, left ventriculography." (Tr. at 174.)

On November 26, 2002, Dr. Wehner evaluated a myocardial perfusion scan and concluded Claimant has "a mildly abnormal

8

Sestamibi response to exercise stress testing. This study is consistent with mild inferior wall myocardial ischemia. Ejection fraction is 60%." (Tr. at 218.)

On November 26, 2002, Michael Gibbs, M.D., Pro-Imaging Diagnostic Center, evaluated a treadmill stress test and concluded the test was negative for ischemia, negative for exercise induced chest pain, no significant exercise induced arrhythmias, normal hemodynamic response to exercise, normal functional capacity, and "Duke treadmill score of +11, indicating a good prognosis." (Tr. at 220.)

On February 20, 2003, George Vettiankal, M.D., Cabell Huntington Hospital, performed a diagnostic left heart catheterization, selective coronary angiogram and left ventriculography. In his cardiac catheterization report, he concluded: "Impression: 1. No significant coronary artery disease. 2. Normal left ventricular ejection fraction. 3. Normal left ventricular end diastolic pressure... I have instructed the patient to return to primary care physician at Lincoln Primary Care Center for further followup." (Tr. at 222-23.)

On August 14, 2003, Richard E. McWhorter, M.D. interpreted a PA [pulmonary artery] and lateral chest x-ray and found: "The appearance of the heart and lungs is within normal limits." (Tr. at 249.)

The record contains reports from Lincoln Primary Care Center

9

dated August 31, 2000, through October 30, 2003.  (Tr. at 226-64.)
An October 15, 2003, form signed by Shelley Bailey, M.D. states
Claimant has the following disabilities:  "carpal tunnel syndrome,
chronic back pain, knee pain, hepatitis C, depression, insomnia,
cough."  (Tr. at 247.)  Dr. Bailey concludes:  "Patient with
multiple problems as above and has not worked for years due to these
problems.  Unlikely he will ever return to work force.  He will
require on-going care for chronic problems."  (Tr. at 248.)

     Reports dated April 24, 2003, and January 22, 2003 are
addressed to Dr. Ozturk and signed by Heidi M. Wehrheim, M.D.  These
reports state Claimant is requesting prescriptions of Lortab.  Dr.
Wehrheim asks Dr. Ozturk for information about Claimant's pain
management plan.  (Tr. at 251-52.)

     A progress note dated January 8, 2001 is signed by William
Dalton, M.D.  Dr. Dalton indicates Claimant has a history of carpal
tunnel syndrome with chronic pain, hepatitis C, and sleep
disturbances.  (Tr. at 257.)

     On September 17, 2003, a State agency medical source completed
a Physical Residual Functional Capacity Assessment and opined that
Claimant could perform light work with the ability to occasionally
climb, balance, stoop, kneel, crouch, and crawl.  The evaluator
found no manipulative, visual, or communicative limitations, and no
environmental limitations with the exception of avoiding extreme
cold and hazards.  (Tr. at 266-73.)  The evaluator found

"insufficient evidence" to provide an assessment prior to September 30, 2000, the date last insured. (Tr. at 274-81.)

The record contains reports from Barboursville Physical Therapy dated September 9, 2003 through November 13, 2003. The records show claimant attended twelve sessions. (Tr. at 310-12.) The therapy was prescribed by Dr. Ozturk on August 26, 2003 for twice a week for six weeks. (Tr. at 313.)

On January 27, 2004, a State agency medical source completed a Physical Residual Functional Capacity Assessment and opined that Claimant could perform light work with the ability to occasionally climb, balance, stoop, kneel, crouch, and crawl. The evaluator found no manipulative, visual, or communicative limitations, and no environmental limitations with the exception of avoiding extreme cold, heat, and hazards. (Tr. at 363-70.) The evaluator found "insufficient medical evidence prior to August 30, 2000 DLI [date last insured]." (Tr. at 363.)

The record contains reports dated October 10, 2001, and August 28, 2001 from Brian P. Hecht, M.D. to Dr. Ozturk. These reports relay that Dr. Hecht treated Claimant for left knee pain. (Tr. at 373-81.) He states: "X-rays of his left knee obtained today reveal maintenance of joint space. The patella is centralized within the trochlea without evidence of fracture." (Tr. at 377.) He further states: "He states his pain is moderate. He denies having a limp and does not use any assistive devices. His ambulation distance is

11

limited to six blocks.  He does stairs normally.  He denies having difficulty putting on his shoes and socks." (Tr. at 380.)

The record contains a March 3, 2004 report from Thomas F. Scott, M.D. to Dr. Ozturk.  This report relays that Dr. Scott treated a small ganglion cyst on Claimant's right wrist and addressed Claimant's complaints of right foot pain.  Dr. Hecht stated that examination and x-rays of the wrist and foot were normal. (Tr. at 372.)

The record contains reports from Cabell Huntington Hospital Regional Pain Management Center dated December 3, 2003, through March 23, 2005, showing treatment by Dr. Ozturk.  (Tr. at 381-400.) The reports show that Claimant had trigger point injections on July 28, 2004, February 22, 2005, and March 23, 2005. (Tr. at 381-2, 388.)  The reports further show Claimant had epidural steroid injections on December 3, 2003, January 29, 2004, and April 21, 2004.  (Tr. at 391, 395, 398.)

A February 9, 2005, progress note from Dr. Ozturk states:

> Signs of aberrant drug use...  He is taking Neurontin, Klonopin, Effexor, Claritin, Oxycodone 5 mg q.d. p.r.n., Zantac, Accupril, Ambien, Flexeril and Interferon.  He requests an increased dose in his pain medicine.  We do not want to do that today.  He is taking Neurontin 800 mg t.i.d. and Flexeril 10 mg b.i.d.  We will get him scheduled for some trigger point injections.  We may do some steroid injections later on but for now we will hold off.

(Tr. at 383.)

The record contains mostly illegible notes, forms, and

hematology lab results from Marshall University Physicians and Surgeons, Inc., dated March 23, 2000, through April 1, 2005. (Tr. at 401-42.) The records appear to relate primarily to Claimant's hepatitis C and interferon treatment.

On May 24, 2004, Michael W. Gibbs, M.D., Family Medical Center, reported Claimant was experiencing atypical chest pain and that he would obtain a catheterization report.  He further noted Claimant was treating with Dr. Shora for Hepatitis A, B, and C.  (Tr. at 446.)

On August 25, 2004, Dr. Gibbs reported he was treating Claimant for dermatitis, chronic, with secondary infection. He stated: "He has multiple excoriated lesions on his hands with different places of healing.  He actually picks at the very small vesicular areas which then have an ulcer type of appearance."  (Tr. at 445.)  He noted Claimant was being treated for chronic pain by Dr. Ozturk.  He further noted Claimant's hepatitis, previous substance abuse, and depression.  (Tr. at 445.)

On December 28, 2004, Dr. Gibbs reported Claimant had osteoarthritis of the cervical and lumbar spines, gastroesophageal reflux disease, insomnia, depression with anxiety features, and hepatitis B and C with interferon therapy.  He noted Claimant was also treating with Dr. Shora for his hepatitis and Dr. Ozturk for pain management.  (Tr. at

13

444.)

On March 22, 2005, Dr. Gibbs reported that he was treating Claimant for acute bronchitis, hepatitis B and C, hypertension, chronic pain, and depression. Dr. Gibbs stated Claimant would continue to treat with Dr. Ozturk for pain management, Dr. Shora for his hepatitis, and Prestera Mental Health for his depression. (Tr. at 443.)

On May 24, 2005, Claimant's representative provided records from Lincoln Primary Care Center, Inc. covering the time period of March 6, 2003 through October 21, 2004. (Tr. at 479-91.) He noted that the records demonstrated "Claimant is suffering from multiple impairments including chronic pain and depression. These conditions have existed for a long period of time." (Tr. at 478.) Although largely illegible, the court notes the records confirm Claimant's treatment with Dr. Shora for hepatitis and Prestera for depression, as well as treatment for allergies, nausea, pain, fatigue, arthritis, tobacco dependancy, coughing, and bronchitis. (Tr. at 483, 484, 486, 487, 490.)

Psychological Evidence

On January 16, 2001, Kenneth Devlin, M.A., Licensed Psychologist, Cabell Huntington Hospital, Regional Pain Management Center, made the following assessment in a progress note:

    Axis I:   Major depression, NOS
              Rule out bipolar disorder.

14

                    Alcohol abuse, remission (?)
                    Pain disorder associated with psychological
                    factors and general medical condition.
Axis II: No diagnosis.
Axis III: Lumbar radiculopathy.
                    Myofascial pain syndrome.
                    Sacroiliac joint syndrome.
Plan: The patient has, pretty much, discontinued caffeine. He is going to go back on the t.i.d. dose of Neurontin. I will see him in approximately a month. If he is stable with the medication. I will reassess for additional services that may be indicated.

(Tr. at 185-86.)

The record contains clinical notes from Prestera Center for Mental Health Services, Inc. dated January 16, 2002, through November 13, 2002. (Tr. at 189-218.) Although largely illegible, the most recent summary note dated November 13, 2002, states "Claimant related he continues to abstain from alcohol although he has had some urges to consume alcohol recently since his arrest." (Tr. at 189.) A summary note dated November 7, 2002, states that on October 27, 2002 Claimant "got intoxicated and got in a MVA [motor vehicle accident]. Charged with DUI [driving under influence] and driving without a license." (Tr. at 191.) A summary note dated November 23, 2002 states Claimant "reported he was arrested for DUI on the evening of 9/21." (Tr. at 194.) A summary note dated July 25, 2002, signed by W. Andrew Riffle, M.A. states claimant has "moderate to mild anxiety and mild depressive symptoms were indicated, as was moderate to mild loss of energy." (Tr. at 198.) The initial assessment dated January 16, 2002 states "moderate depression, anxiety." (Tr. at 214.)

The record also contains clinical notes from Prestera Center dated January 13, 2003 through December 4, 2003. (Tr. at 314-41.) Although largely illegible, the most recent summary note dated December 4, 2003, states that Claimant's "mood appeared euthymic, generally; affect was broad and appropriate...depression and anxiety symptoms appear relatively well stabilized at this time. Coping mechanisms and self-esteem seem somewhat improved." (Tr. at 315.)

A note from Prestera Center dated August 20, 2003, states:

> He related that his home confinement will end on 8/31 if there are no problems therein... Client related that he's been in contact with Voc Rehab and was told he could work at the Salvation Army store to start his participation in their program. Client feels he'll probably decline involvement therein because he doesn't want to work in an urban area... Client's mood appeared euthymic; affect was broad and appropriate to mood... Client's depressive and anxiety symptoms appear relatively quite well stabilized at this time. Emotional control/modulation, coping mechanisms, self-esteem, and insight all seem improved.

(Tr. at 321-22.)

A summary note from Prestera Center dated January 13, 2003, indicates claimant was last assessed on October 21, 2002. The evaluator, Mr. Riffle notes Claimant has "mild increases in feelings of hopelessness and loss of energy as compared to last assessment." (Tr. at 341.)

On September 18, 2003, a State agency medical source completed a Psychiatric Review Technique form for July 1, 2003, to present and opined that Claimant's depression and anxiety impairments were

16

not severe.  The evaluator found that Claimant had only mild limitations in restriction of activities of daily living, difficulties in maintaining social functioning, difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation.  The evaluator further found that the evidence does not establish the presence of "C" criteria.  (Tr. at 296-309.)  The evaluator found insufficient evidence to provide an opinion for "day after prior ALJ Decision 8/31/00 to 9/30/00 (DLI)[date last insured]."  (Tr. at 282-94.)

On January 13, 2004, Ernie Vecchio, M.A., licensed psychologist, and Margaret J. Gomez, psychological assistant, evaluated Claimant and provided a mental status examination report.  (Tr. at 343-48.)  The evaluators found:

> The claimant reported a substance abuse history.  He stated he has not had anything to drink over the last thirty days.  He reported he has a history of using marijuana and has not used the substance for the last thirty days... He described legal difficulties as "drunk driving about a year ago and receiving stolen property and charged with a felony in 1989... Diagnoses: (DSM-IV Diagnosis)
> Axis I:   Major Depressive Disorder, Moderate severity, by history
>           Anxiety Disorder, NOS, by history
>           Alcohol Abuse, Early Full Remission (not used in 30 days by self-report)
>           Cannabis Abuse (Marijuana), Early Full Remission (not used in 30 days by self report)
> Axis II:  V71.09 No Diagnosis
> Axis III: Back, Neck, arms, wrist, ankle, shoulder, knees (sic) problems and hepatitis C, by self report...
> Activities List:  He cooks by using microwave food and washes any dishes he might have and does his laundry.  He goes to the Post Office and sometimes goes to the grocery

store with his sister and aunt.  He watches TV, listens
to the radio, takes out the trash, and reads books.  He
said he reads educational books "to get some knowledge
from them."  In the summertime and fall, he rakes up a
little weeds.  He likes to build and work on cars but
limits his work to checking radiators now because he does
not do any major work.

Social Functioning:

During the evaluation:  He related in a cooperative and
congenial manner.  Interaction with the examiner was
within normal limits... Concentration was within normal
limits, based on calculations of Serial 3s... Based on
the mental status examination and clinical interview,
persistence was within normal limits... pace was within
normal limits... Immediate memory was within normal
limits, based on ability to recall 4 of 4 words
immediately... Recent memory was within normal limits,
based on ability to recall 4 of 4 words after 30
minutes... If granted benefits, the claimant is capable
of managing his finances.

(Tr. at 344-47.)

On January 26, 2004, a State agency medical source completed
a Psychiatric Review Technique form (T-II 9/1/00 to DLI [date last
insured] 9/30/00; T-XVI 7/3/00 to current) and opined that
Claimant's depression and anxiety impairments were not severe.  The
evaluator found that Claimant had only mild limitations in
restriction of activities of daily living and mild difficulties in
maintaining social functioning.  The evaluator found Claimant had
no difficulties in maintaining concentration, persistence.  The
evaluator further found that the evidence does not establish the
presence of "C" criteria.  (Tr. at 349-61.)

On July 26, 2004, Sohail A. Rana, M.D., psychiatrist, reported
that Claimant was currently receiving treatment at Prestera Center
for Mental Health Services.  Dr. Rana stated:  "At this time, his

18

symptoms are well-controlled [sic, with] a maintenance dose of medication and individual therapy.  We are aware that his treatment for hepatitis can exacerbate depressive symptoms and we will monitor his status accordingly."  (Tr. at 438.)

On May 23, 2005, Claimant's representative provided records from Prestera Center for Mental Health Services covering the time period of November 18, 2003, through May 13, 2005.  He noted "Claimant's GAF has fallen from 61 to 57 over this time period." (Tr. at 447, 448-477.)  The records show Claimant treated with  W. Andrew Riffe, licensed psychologist, every two to four weeks for psychotherapy and every one to three months for medication reviews. (Tr. at 456, 459, 464, 468, 472, 477.)  An assessment dated May 13, 2005, states:  "Moderate depressed mood, guilt responses, feelings of hopelessness, energy loss and agitation were indicated, as well as mild anxiety, panic symptoms, phobic responses, apathy, concentration difficulties, sleep disruption, loss of interest, social withdrawal, and irritability."  (Tr. at 477.)

<u>Claimant's Challenges to the Commissioner's Decision</u>

Claimant argues that the ALJ failed to consider the combined effects of Claimant's physical and mental problems, both exertional and nonexertional.  Claimant also asserts the ALJ erred in assessing Claimant's credibility and in making statements which reflected a prejudicial personal bias.  (Tr. at 19, Pl.'s Br. at 4-7.)

The Commissioner argues that the ALJ's findings are supported by substantial evidence and should be affirmed because Claimant's impairments considered individually and in combination, do not meet or equal a listed impairment.  The Commissioner further argues that the Commissioner's decision denying Claimant's DIB claim should be affirmed because, during the period on or before September 30, 2000, Claimant has not met his burden of showing "disability" within the meaning of the act.  The Commissioner also asserts that Claimant's credibility was properly assessed.   (Def.'s Br. at 8-12.)

Combined Effects

Claimant first asserts that the ALJ failed to consider the combined effects of Claimant's physical and mental problems, both exertional and nonexertional. (Pl.'s Br. at  5-6.) Claimant lists his disabilities as "coronary artery disease, neck and shoulder pain syndrome, degenerative disc disease, hepatitis C, manic depressive disorder, anxiety disorder, alcohol/cannabis abuse (in remission), cervical herniation, poor appetite, poor sleep, social withdrawal, concentration difficulties, irritability, chronic pain, numbness in hands, tenderness in low back, shoulder and left knee, bilateral carpal tunnel syndrome with chronic pain, mild inferior wall myocardial ischemia, myofascial pain syndrome, lumbar disopathy with lumber radiculopathy, sacroiliac joint syndrome, bilateral ulnar entrapment, fatigue, skin lesions, interferon

treatment for liver disease." (Pl.'s Br. at 5.) Claimant argues that his "physical and mental impairments in combination equal a Listed Impairment... In the alternative... his impairments prevent him from engaging in substantial gainful employment." (Pl.'s Br. at 5.)

The Commissioner responds that the disability determination is based upon functional limitations, not medical diagnoses, and that many of the conditions listed by Claimant have been effectively treated and impose only minimal functional limitations. (Tr. at 10-11.) Further, the Commissioner asserts that with respect to the current period, beginning September 2003, when Claimant filed for SSI, Claimant has not made the required showing of disability. The Commissioner states that two state agency physicians concluded that Claimant could perform light exertional work and a state agency psychologist found no evidence of treatment for depression prior to September 30, 2000 and only mild limitations for the time period beginning in September 2003. (Def.'s Br. at 9.)

Claimant argues that the ALJ failed to consider his impairments in combination. (Pl.'s Br. at 4-5.) Claimant's argument in this regard is mostly boilerplate and does not specifically address how this ALJ failed to consider Claimant's combined impairments.

The court finds that the ALJ adequately considered Claimant's impairments alone and in combination in keeping with 20 C.F.R. §§

404.1523 and 416.923 (2007). The ALJ's decision reflects a careful consideration of all of Claimant's impairments and their combined effect. In her decision, the ALJ stated that Claimant's impairments, both alone and in combination, including those deemed nonsevere, did not meet or equal a listing. The ALJ found:

> The medical evidence indicates that the claimant has traumatic degenerative join disease with bilateral carpal tunnel syndrome post surgery and myofascial pain syndrome, as well as mild coronary artery disease, hepatitis C, mild depression, and chronic poly-substance abuse, impairments that are "severe" within the meaning of the Regulations. However, they are not "severe" enough to meet or medically equal, either singly or in combination to one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4. The claimant's arthritic limitations essentially restrict him to a limited range of light and sedentary exertional activity. Since he can walk and stand (for short periods) without any assistive device, his arthritic pain in not sufficiently severe to satisfy any of the arthritic Listings, such as § 1.04 or § 14.02. Likewise, the claimant's hepatitis C has resulted in much less severe functional limitations (even with interferon treatment) than the hepatitis described in § 5.05 of the Listing of Impairments. Likewise, the claimant's depression and poly-substance abuse reflect a mental condition that neither meets nor equals the severity of any mental conditions described in § § 12.04 or 12.09 of the Listing of Impairments. The claimant has the following mental limitations set forth in "Part B" of the mental listings: mild restriction of activities of daily living; mild difficulties in maintaining social functioning; and mild difficulties in maintaining concentration, persistence, or pace.

(Tr. at 18-19.)

Elsewhere in the decision, in her analysis of Claimant's residual functional capacity and in assessing Claimant's subjective complaints, the ALJ's decision reflects a careful consideration of

22

Claimant's combined impairments.

<u>Credibility and Personal Comment</u>

Claimant next asserts the ALJ erred in assessing Claimant's credibility. (Tr. at 25, Pl.'s Br. at 6-7.)  Claimant argues that the objective evidence supports his subjective complaints of disability and pain. (Pl.'s Br. at  6-7.) Claimant further asserts the ALJ's comment that he "is following a lifestyle that he prefers and is obtaining what he needs without working, including alcohol and cigarettes and female companionship" reflects a personal bias against him.  (Tr. at 19, Pl.'s Br. at 7.)

The Commissioner argues that the ALJ did not improperly rely upon personal feelings, when commenting upon Claimant's wide range of daily activities because "the regulations and Fourth Circuit case law provide that daily activities are to be considered in evaluating subjective complaints, 20 C.F.R. §§404,1520, 415.929; see <u>Mickles v. Shalala</u>, 29 F.3d 918, 930 (4th Cir. 1994)(observing that daily activities were an acceptable measure of how pain affected the claimant's ability to function)."  (Def.'s Br. at 10.)

Contrary to Claimant's assertions, the ALJ's decision fully complied with the requirements of Social Security Ruling 96-8p that

> [i]n assessing RFC, the adjudicator must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not "severe." While a "not severe" impairment(s) standing alone may not significantly limit an individual's ability to do basic work activities, it may--when considered with

23

limitations or restrictions due to other impairments--be
critical to the outcome of a claim.  For example, in
combination with limitations imposed by an individual's
other impairments, the limitations due to such a "not
severe" impairment may prevent an individual from
performing past relevant work or may narrow the range of
other work that the individual may still be able to do.

SSR 96-8p, 1996 WL 362207, *34477 (1996).

Social Security Ruling 96-7p clarifies when the evaluation of
symptoms, including pain, under 20 C.F.R. §§ 404.1529 and 416.929
requires a finding about the credibility of an individual's
statements about pain or other symptom(s) and its functional
effects; explains the factors to be considered in assessing the
credibility of the individual's statements about symptoms; and
states the importance of explaining the reasons for the finding
about the credibility of the individual's statements.  The Ruling
further directs that factors in evaluating the credibility of an
individual's statements about pain or other symptoms and about the
effect the symptoms have on his or her ability to function must be
based on a consideration of all of the evidence in the case record.
This includes, but is not limited to:

- The medical signs and laboratory findings;

- Diagnosis, prognosis, and other medical opinions provided

by treating or examining physicians or psychologists and

other medical sources; and

- Statements and reports from the individual and from

treating or examining physicians or psychologists and

other persons about the individual's medical history, treatment and response, prior work record and efforts to work, daily activities, and other information concerning the individual's symptoms and how the symptoms affect the individual's ability to work.

In his decision, the ALJ considered the evidence of record related to Claimant's impairments and concluded that while traumatic and degenerative joint disease, bilateral carpal tunnel syndrome (post surgery), myofascial pain syndrome, mild coronary artery disease, hepatitis C, mild depression, and chronic poly-substance abuse were severe impairments, he retained the functional capacity to perform most unskilled light exertional work. (Tr. at 17-21.) She reasoned that Claimant's complaints were inconsistent with the objective medical evidence and Claimant's daily activities. (Tr. at 19-20.) The ALJ found:

> With respect to assessing listing issues (for mental Part B and for physical problems) and the appropriate residual functional capacity, one looks to the claimant's daily activities and the claimant's credibility, as well as the medical documentation. This gentleman engages in fairly expansive daily activities designed to insure his own comfort and survival without working: He lives in a small home he built himself (which he says is located on his brother's property), which he heats with wood or coal, which requires consistent physical effort and attention; he socializes with his mother and brother, obtains cigarettes and food even though he has no license as it was taken from him on account of DUI conviction; has a girlfriend who is on Supplemental Security Income and therefore not working whom he sees regularly and who does drive him about, he has been under supervision and home confinement which he successfully completed, he keeps his medical appointments pretty regularly. He

25

states that he cleans and maintains his home. He has worked on an old residence on the property (see Ex. B 20F). He likes to draw and uses a computer. He has obtained food stamps for food and obtains money from his mother. He obtains medications through a medical card, including Oxycodone. He likes to polish things such as brass, he says and (sic) reads magazines concerning nature related subjects such as trees. He will take care of the trees on the property as well he says. He watches t.v. These activities are not consistent with someone who is disabled by depression or by physical incapacity. It appears Mr. Adkins is following a lifestyle that he prefers and is obtaining what he needs without working, including alcohol and cigarettes and female companionship. However in Ex. B 20F it is indicated that at one point Mr. Adkins did state he was considering an alternative to making a living if disability did not come through.

Mr. Adkins claims to have been disabled since 1997 (apparently when he last reported income, though he has indicated that he has had "odd jobs" since, see Ex. B-22F) but there is little in the medical records to support disability prior to 09/2000, his date late (sic) insured. There is a dispositive ALJ decision denying benefits dated August 30, 2000.

With respect to credibility, this gentleman does not appear to be telling the truth concerning his consumption of alcohol and drugs, either to the undersigned or to various examiners. Nor does he appear motivated to improve his living and working situation. He has claimed that he has had no alcohol since his DUI and accident on Halloween, 2002 (and since he applied for Supplemental Security Income on 7/2003), and no street drugs for years, but the medical records reflect otherwise and his testimony is evasive. He claims that he has no recollection as to when he might have been drinking and using drugs but that his girlfriend has told him that he may have been drinking. He admits he may have fallen off the wagon when his cousin hanged himself in 2003. (Ex. B22F, on 1/13/2004, he admitted that he had used alcohol and marijuana within 30 days). He claims he always forgets if he is smoking marijuana while he is drinking. While Mr. Adkins claims depression, his doctors would not have placed him on the interferon program had they thought he was already suffering a serious level of depression.

26

> Mr. Adkins has shown little motivation for improvement. While under home confinement for the DUI, he met with vocational rehabilitation, who suggested a residential program in Institute, West Virginia. Mr. Adkins declined to participate in a program that would have allowed him to gain treatment and skills without having to have a driver's license to utilize the services. Similarly, he refused to work at the Salvation Army, claiming transportation difficulties (even though his girlfriend drives and is unemployed on SSI). This sort of response reflects on credibility, as it indicates that he is not disabled from all activities, he simply prefers his lifestyle and location where he is.

(Tr. at 19-20.)

While Claimant disagrees with the ALJ's findings cited above, the court has reviewed them and Claimant's testimony at the administrative hearing and finds that the ALJ's credibility findings are supported by substantial evidence. The conclusions drawn by the ALJ are reasonable, and the court can find no material misstatement by the ALJ in her findings demonstrating a personal bias against Claimant. Additionally, Claimant's largely conservative treatment and the lack of objective medical evidence supporting his subjective complaints, along with the other factors identified in SSR 96-7p, all counsel in favor of a finding that Claimant's subjective complaints are not entirely credible.

The court finds that the ALJ properly weighed Claimant's subjective complaints of pain and properly assessed Claimant's credibility and the combination of his impairments, in keeping with the applicable regulations, case law, and social security ruling ("SSR") and that his findings are supported by substantial

evidence.   20 C.F.R. § 404.1529(b) (2006); SSR 96-7p, 1996 WL 374186 (July 2, 1996); Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996).

Claimant's Implied Motion to Remand

In his two-paragraph Supplemental Brief in Support of his Motion for Judgment on the Pleadings (docket no. 13), Claimant asserts that this matter should be reversed and remanded for rehearing as a Fully Favorable Decision dated April 11, 2008 granting Supplemental Security Income benefits as of October 4, 2006 (the date the subsequent application for Supplemental Security Income benefits was filed) under Title XVI constitutes new material and additional evidence.  (Pl.'s Supplemental Br. at 1.)

The court construes this aspect of Plaintiff's supplemental brief as an implied motion to remand pursuant to sentence six of 42 U.S.C. § 405(g).  The new evidence consists of the Fully Favorable Notice, Order, and Decision of Attorney Advisor. (docket no. 13-2). The April 11, 2008, Attorney Advisor Decision states that the decision on Claimant's prior Title II and Title XVI applications is not being reopened and revised because that decision is still on appeal to Federal Court.  (Pl.'s Supplemental Br. at  document 13-2, page 4.)

The Commissioner did not respond to Claimant's supplemental brief.

In considering Claimant's motion to remand, the court notes

initially that the social security regulations allow two types of remand. Under the fourth sentence of 42 U.S.C. § 405(g), the court has the general power to affirm, modify or reverse the decision of the Commissioner, with or without remanding the cause for rehearing for further development of the evidence. 42 U.S.C. § 405(g); Melkonyan v. Sullivan, 501 U.S. 89, 97 (1991). Where there is new medical evidence, the court may remand under the sixth sentence of 42 U.S.C. § 405(g) based upon a finding that the new evidence is material and that good cause exists for the failure to previously offer the evidence. 42 U.S.C. § 405(g); Melkonyan, 501 U.S. at 97. The Supreme Court has explicitly stated that these are the only kinds of remand permitted under the statute. Melkonyan, 501 U.S. at 98.

In order to justify a remand to consider newly submitted medical evidence, the evidence must meet the requirements of 42 U.S.C. § 405(g) and Borders v. Heckler, 777 F.2d 954, 955 (4th Cir. 1985). In Borders, the Fourth Circuit held that newly discovered evidence may warrant a remand to the Commissioner if four prerequisites are met: (1) the evidence is relevant to the determination of disability at the time the application was first filed and not simply cumulative; (2) the evidence is material to the extent that the Commissioner's decision "might reasonably have been different" had the new evidence been before him; (3) there is good cause for the claimant's failure to submit the evidence when

the claim was before the Commissioner; and (4) the claimant has presented to the remanding court "at least a general showing of the nature" of the newly discovered evidence.   Id.

Although Claimant has made a general showing of the nature of the new evidence by submitting the April 11, 2008, Attorney Advisor Decision, the court finds that Claimant has not met the remaining requirements of Borders.   In particular, Claimant has not shown relevancy because the new evidence post dates the ALJ's July 6, 2005 decision by nearly three years and the April 11, 2008, Attorney Advisor Decision specifically states that the decision on Claimant's prior Title II and Title XVI applications is not being reopened and revised because that decision is still on appeal to Federal Court.

Also, the court notes that the decision before the court is for an application for both DIB and SSI.   The April 11, 2008, Attorney Advisor Decision is for SSI only and finds Claimant was disabled as of October 4, 2006, the date the application for supplemental security income was filed. It is further noted that the April 11, 2008, Attorney Advisor Decision states that Claimant provided no treatment notes from Dr. Ozturk and no office notes from Prestera Center with the October 4, 2006, application, and relied primarily upon reports from M. Gibbs, M.D., his treating physician.   The subject decision relied on significant evidence from Dr. Ozturk and Prestera Center, and had only four reports from

Dr. Gibbs for review.  As a result, the evidence is not relevant to the determination of disability at the time the ALJ rendered her decision.  Thus, the court finds that Claimant's implied motion to remand should be denied.

After a careful consideration of the evidence of record, the court finds that the Commissioner's decision is supported by substantial evidence.  Accordingly, by Judgment Order entered this day, the Plaintiff's Motion for Judgment on the Pleadings is DENIED, the final decision of the Commissioner is AFFIRMED and this matter is DISMISSED from the docket of this court.

The Clerk of this court is directed to transmit copies of this Order to all counsel of record.

ENTER: March 17, 2009

_Mary E. Stanley_
Mary E. Stanley
United States Magistrate Judge